## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 05 2016, 8:21 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Joshua Flowers
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Erik H. Carter
Noblesville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jordan D. Christie, *Appellant-Respondent,* | April 5, 2016 |
| v. | Court of Appeals Case No. 14A05-1507-JP-985 |
| | Appeal from the Daviess Circuit Court |
| Tamara L. Waller, *Appellee-Petitioner.* | The Honorable Lynne E. Ellis, Special Judge |
| | Trial Court Cause No. 14C01-1109-JP-243 |

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Respondent, Jordan D. Christie (Father), appeals the trial court's Order awarding custody of his minor child, Sophia Marie Christie (Child), to Appellee-Petitioner, Tamara L. Waller (Mother).

We affirm.

## ISSUES

Father raises three issues on appeal, which we consolidate and restate as the following two issues:

(1) Whether the trial court abused its discretion by awarding custody of the Child to Mother; and

(2) Whether the trial court violated Father's right to due process by failing to act in an impartial manner and coercing the parties into waiving the ninety-day deadline set forth in Indiana Trial Rule 53.2(A) for issuing its decision.

## FACTS AND PROCEDURAL HISTORY

On July 22, 2011, the Child was born out of wedlock to Father and Mother. Father subsequently executed a paternity affidavit. For several months following the Child's birth, Mother and Father lived together in Father's residence and co-parented. Pursuant to Father's execution of the paternity affidavit, on September 21, 2011, the Daviess County IV-D Prosecutor's Child Support Division filed a petition to establish child support. At the time of this

filing, the parties were still living together with the Child. However, their relationship ultimately deteriorated, and an acrimonious custody battle ensued.

[5] On January 16, 2012, Mother moved out of Father's house, taking the Child with her. The next day, Mother filed a petition on behalf of the Child to obtain a protective order against Father. In her petition, Mother cited two instances in which Father had fallen asleep while caring for the Child. Mother also alleged that Father did not want her to take the Child when she moved out. On January 25, 2012, the trial court found insufficient evidence to justify a protective order and, accordingly, dismissed Mother's petition.

[6] After Mother moved out, Father claimed that she began denying him any opportunity to see the Child. On January 25, 2012, Father filed a Petition to Establish Visitation Schedule, and on February 10, 2012, he filed a Petition for Custody. On February 24, 2012, the trial court conducted a hearing. Pending a final hearing, the trial court issued an interim order granting primary physical custody of the Child to Mother, and Father received parenting time in accordance with the Indiana Parenting Time Guidelines (Guidelines).

[7] Despite the court's temporary order, Mother began placing additional restrictions on Father's parenting time, such as prohibiting overnight visits and insisting that she supervise Father's parenting time. As a result, both parties summoned the police during numerous exchanges of the Child. In addition, according to Father, on March 22, 2012, the Department of Child Services (DCS) commenced an investigation against him after receiving a report that the

Child had access to Father's firearms. Father explained at the final hearing that the allegations were found to be unsubstantiated.

[8] In March of 2012, Father noticed that Mother began taking the Child to the doctor, clinics, and the emergency room on a frequent basis. At some point, the Child was diagnosed with asthma, was tested for allergies, and had to have surgery due to a clogged tear duct. Both Father and the Child's court-appointed special advocate, Sandra Bowman (CASA Bowman), became concerned that Mother was seeking unnecessary medical attention for the Child.

[9] On March 20, 2012, Mother filed another petition for a protective order on the Child's behalf. She alleged that the Child returned from an overnight parenting time with Father with a large welt on her neck, jaw, and chin. Mother also claimed that the Child had "extreme diaper rash w[ith] blisters covering ENTIRE diaper area." (Respondent's Exh. R). Finally, Mother claimed that the Child had contracted a parasite as the result of drinking water from a well while in Father's care. The trial court issued an *ex parte* protective order the same day and set the matter for a hearing. On April 2, 2012, the trial court dismissed the *ex parte* protective order.

[10] In July of 2012, Father and Mother reconciled, and Mother and the Child moved back into Father's house. The reconciliation was short-lived; in August of 2012, Father asked Mother to move out, and Mother took the Child with her. Thereafter, Mother refused to allow Father to see the Child. As a result, in September and October of 2012, Father requested that the police conduct

welfare checks, but they were unable to locate Mother or the Child. On October 31, 2012, Father filed an information for contempt, claiming he had been denied parenting time since August of 2012 and had no knowledge of where the Child was living. On the same day, Father filed a Petition to Modify, seeking custody based on a change in circumstances—specifically, that there was a warrant for Mother's arrest;[1] that Mother lacked a stable residence; and that Mother suffered from a drinking problem.

[11] On December 1, 2012, Father briefly saw the Child for the first time since August. However, Father stated that Mother would not allow him to hold or interact with the Child and that the Child appeared not to recognize him. Thereafter, Father attempted to resume their prior parenting time schedule, but Mother only allowed sporadic visits.

[12] On December 20, 2012, Mother filed another petition for a protective order. In her petition, Mother accused Father of stalking and harassment, indicating that he had called the police to her "residence in excess of 100+ times." (Respondent's Exh. T). Mother also claimed that Father had "grabbed [and] handled [her] in a manner that resulted in bruising [and] scrapes on hand, arm [and] legs." (Respondent's Exh. T). Mother simultaneously filed a petition for

---

[1] On April 21, 2012, Mother was arrested and charged with conversion, a Class A misdemeanor, after she was observed shoplifting at Wal-Mart. At the time, it was also discovered that Mother had a warrant for her arrest out of Tippecanoe County, where she had been charged with attempted fraud, a Class D felony. Mother subsequently entered into a pre-trial diversion program on the conversion charge, and the case was dismissed on June 18, 2013. As to the Class D felony attempted fraud case, Mother pled guilty on November 21, 2012; she was sentenced to 545 days, of which 541 days were suspended to probation.

a protective order on behalf of the Child, alleging that, seven months earlier, the Child had returned from two overnight visits with Father with bruises on her neck, belly button, and back, as well as severe diaper rash. Although Mother received an *ex parte* order of protection as to herself, the trial court denied her petition for the Child based on a lack of evidence. On several instances after obtaining the protective order, Mother informed Father that he could only have his parenting time if he did so in her home, under her supervision. Because this arrangement would have been a violation of the protective order, Father was not able to see the Child during these times.

[13] On December 27, 2012, Father filed another information for contempt based on Mother's denial of his parenting time. On January 4, 2013, the trial court held a combined hearing on Father's contempt allegations and Mother's protective order. Mother admitted that she had violated the court's parenting time order; thus, the trial court found her to be in contempt. In lieu of sanctions, the trial court permitted Mother to purge the contempt by adhering to the parenting time order. The trial court also dismissed Mother's protective order.

[14] On January 29, 2013, Mother contacted DCS and reported that, following her recent parenting time with Father, the Child "began biting and choking herself [ten] to [fifteen] min[utes] at a time." (Respondent's Exh. G). Mother also stated that the Child had peed through her diaper, and when Mother tried to change her diaper, the Child "ran to the corner and started yelling 'no daddy hurts.'" (Respondent's Exh. G). Mother indicated that the Child then fought Mother's attempts to change her diaper. Mother also informed DCS that she

was concerned because Father keeps firearms in his home and has a pet snake. DCS investigated and found Mother's claims regarding any alleged sexual abuse to be unsubstantiated. Furthermore, DCS visited Father's home and found that his firearms were all properly locked in a safe, and his snake was contained in a locked cage. DCS observed that the Child was "talking, laughing, and giggling" in Father's home, and she appeared "to be very bonded with [Father]." (Respondent's Exh. G).

[15] On February 22, 2013, the trial court conducted another hearing, during which Father and Mother presented an agreement to the court regarding custody and parenting time. On April 3, 2013, the trial court entered a Temporary Order on Pending Matters (Temporary Order), which adopted the parties' arrangements. Specifically, the parties agreed that they would share both legal and physical custody of the Child, and they formulated an equal parenting time schedule.

[16] The existence of a mutual custody agreement did nothing to foster the parties' ability to cooperate and co-parent. On March 1, 2013, Mother sought a protective order in Knox County, Indiana, raising the same allegations against Father as in her prior petition of December 20, 2012, which had been dismissed. At some point, Mother also obtained protective orders against Father's mother and sister for acts of vandalism and harassment. At times throughout the proceedings, both Father and Mother accused each other of stalking and harassment-type behavior. On March 14, 2013, Father filed an information for contempt because Mother repeatedly attempted to pick up the Child at Father's house rather than the location designated in the court's

Temporary Order—*i.e.*, the police station. On April 8, 2013, Father filed a second petition for custody modification. That same day, he also filed a contempt information, stating that he was denied parenting time.

[17] In April of 2013, Mother began taking the Child to see a psychologist based on her concerns that the Child was exhibiting regressive behaviors. Particularly, Mother identified concerns of "tantrum behavior, uh, scratching herself, pulling her hair, uh, becoming very upset, hiding behind objects in the home when she was, uh, upset or anxious. Uh, a lot of, uh, irritability, a lot of generally negative types of emotional behavior." (Tr. pp. 450-51). Although Father never observed any of these behaviors, Mother reported to the psychologist that she believed the Child's behavior had changed in response to having parenting time with Father. The psychologist stated that in his initial encounter with Mother and the Child, he "thought that overall there was probably a little bit of enmeshment" between Mother and the Child. (Tr. p. 466). The psychologist testified that "psychologist[s] call enmeshment probably when parent and child might be a little bit to[o] close so they are functioning more as a unit [rather] than separately." (Tr. p. 466). As to the Child, the psychologist stated that he initially observed behaviors that would fall on the autism spectrum. However, the psychologist clarified that regressive behavior can "also be because children are under a lot of stress, a lot of changes going on in their lives, maybe there is a lot of conflict at home. . . . [W]e needed to rule out whether or not what we were seeing here was the onset of autism or was it . . . more an adjustment reaction to the things happening in her life." (Tr. pp. 466-67). By October of

2013, the psychologist noted significant improvement in the Child and concluded that she does not have autism.

[18] On May 29, 2013, Father filed four separate informations for contempt, all of which alleged that he was denied parenting time.[2] On June 19, 2013, Mother filed a Motion to Change Judge, which was granted the same day. After Mother requested a change of judge, she did not permit Father to exercise his parenting time until July 3, 2013. When Mother allowed Father to have the Child for overnight visits, she insisted that Father bring the Child to the meeting location in the mornings so that Mother could be the one to administer the Child's asthma medicine. Between July 20, 2013, and November 12, 2013, Father was denied his overnight parenting time with the Child.

[19] On June 27, 2013, Mother took the Child to Riley Hospital for Children in Indianapolis, Indiana, for a sleep study. As a result of the sleep study, on August 1, 2013, the Child had surgery to remove her tonsils and adenoids. On August 5, 2013, the Child was hospitalized for dehydration. Then, on August 8, 2013, Mother took the Child to the emergency room because the Child's throat was bleeding. Although medical personnel did not observe any bleeding, the Child was subsequently transferred to Riley Hospital for observation. During the final hearing, Father expressed his frustration over being unable to

---

[2] During a hearing on October 11, 2013, Father conceded that he mistakenly believed Mother had denied him parenting time on dates that were, in fact, Mother's scheduled time with the Child. Accordingly, Father withdrew two of his May 29, 2013 petitions.

obtain any information about the Child when he called the hospital. On August 16, 2013, the Child's primary care physician wrote a letter stating that due to the Child's "current medical condition and psychosocial issues, I feel it medically necessary for her to be in the presence of one of her primary caregivers at all times/24 hours a day until her symptoms are stabilized." (Petitioner's Oct. 15, 2013 Exh. 2). Mother subsequently informed Father that his parenting time would have to occur at the Sheriff's Department under Mother's supervision because she had a doctor's note indicating that the Child had to be in her presence at all times.

[20] On October 11, 2013, Father filed a Petition to Modify Custody. In his petition, Father alleged that Mother interferes with Father's parenting time and that she frequently and unnecessarily takes the Child to the emergency room and medicates the Child with a narcotic pain reliever. Father also raised a possible concern that Mother may be suffering from Munchausen Syndrome by Proxy. Finally, Father argued that he should be awarded custody because he could provide the Child with a more stable home.

[21] On October 15, 2013, the trial court held a hearing on Father's multiple contempt filings. During the hearing, Father testified that Mother continued to deny his parenting time, and he had not seen the Child since August 1, 2013. On November 12, 2013, the trial court issued an order dismissing Mother's pending protective order against Father. Additionally, the trial court modified the Temporary Order of April 3, 2013, such that Father was awarded temporary physical custody of the Child, and Mother was given parenting time

on alternating weekends and during Father's weekday work hours. Furthermore, based on the contention that Mother may have Munchausen Syndrome by Proxy, the trial court prohibited her from taking the Child to any doctor's appointments. The trial court took Father's contempt motions under advisement pending the final hearing.

[22] Between December 11, 2013, and February 18, 2014, Father filed three petitions for rule to show cause as well as a motion for contempt based on Mother's purported violations of court orders. In particular, Father alleged that Mother continued to interfere with the Child's medical matters and took the Child to Indianapolis without Father's knowledge during her parenting time, causing him to be concerned that Mother had taken the Child to see a doctor. Father also stated that Mother was not adhering to the schedule for exchanging the Child, that she was involved in a car accident while following his family members around town, and that she was sending "disturbing" text messages to Father. (Appellant's App. p. 137).

[23] On February 19, 2014, Mother made a report to DCS that Father was neglecting the Child's medical needs. Mother stated that the Child had a drastic weight loss while in Father's care and that Father refused to feed the Child her prescribed meal supplement.[3] Mother also informed DCS that Father

---

[3] The issue of whether the Child actually needed such a meal supplement was heavily contested during the final hearing. Mother presented a note from a nutritionist at Riley Hospital who indicated that the Child was underweight, whereas Father presented evidence from the Child's other doctors that no such supplement was

had been diagnosed with general anxiety (from his time in the military), and stated that he has "shrapnel all over his body." (Respondent's Exh. J). Mother further reported that Father possessed more than sixty guns and 10,000 rounds of ammunition in his home. Finally, Mother stated that there were bruises on the Child's body. When DCS investigated, Mother added that cerebrospinal fluid had been leaking from the Child's nose, and although it had been treated, she was concerned that Father was not handling the Child's medical needs. Similarly, Mother informed DCS that the Child has autism[4] and sleep apnea, and she voiced her doubts about Father's ability to meet the Child's special needs. When DCS interviewed Father, he provided the medical records to contradict Mother's claims about the Child's weight. DCS observed no bruising on the Child, and nothing in the Child's medical records corroborated Mother's claim about cerebrospinal fluid.[5] Father also denied Mother's claim that he has shrapnel all over his body. Regarding the guns and ammunition, Father clarified that he owns six—not sixty—guns, all of which he keeps locked in a safe. Ultimately, DCS determined that the allegations were unsubstantiated.

---

necessary. The Child's pulmonologist indicated that he prescribed the meal supplement only because Mother requested it.

[4] By the time of this DCS report, the Child's psychologist had already determined that the Child does not have autism.

[5] According to CASA Bowman, leaking cerebrospinal fluid is typically observed in "cases where a child has been abused and has head trauma or . . . [a] traffic accident where there has been significant head trauma." (Tr. p. 748).

[24] Following the trial court's November 12, 2013 order that prohibited Mother from taking the Child to any doctor's appointments, Mother continued to contact the Child's health care providers and otherwise intervene in medical matters. As a result, on February 19, 2014, the trial court issued another temporary order to prohibit Mother from having contact with any non-family members—namely, health care and daycare providers—regarding the Child. Also, pending a psychological evaluation and the final hearing, the court ordered that Mother exercise only supervised parenting time. The trial court ordered that Father would continue to have full physical and legal custody of the Child until the final hearing. Between March 27, 2014, and May 7, 2014, Father filed two more petitions for rule to show cause, an information for contempt, and an emergency motion to modify Mother's parenting time based on Mother's alleged violation of the court's various orders.

[25] On February 11-13 and March 27, 2015, the trial court conducted a final hearing on the custody of the Child, parenting time, and the pending contempt motions. At the close of the hearing, the parties agreed that they would waive the ninety-day deadline set forth in Indiana Trial Rule 53.2(A) for the trial court to issue its decision. On March 30, 2015, the trial court issued a temporary order providing Father with primary physical and sole legal custody of the Child pending the final Order. Mother was permitted to have unsupervised parenting time in accordance with the Guidelines. On July 1, 2015, the trial court issued its final Order, awarding primary physical custody of the Child to Mother and ordering that the parties have joint legal custody. The trial court

awarded Father parenting time pursuant to the Guidelines and ordered him to pay child support. Finally, the trial court found Mother to be in contempt and ordered her to pay the sum of $2,500 for Father's attorney fees. On July 14, 2015, Father filed a Motion to Stay pending appeal, which was denied on July 17, 2015.

[26] Father now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Custody*

[27] Father first claims that the trial court abused its discretion by awarding custody of the Child to Mother. In this case, the trial court did not issue special findings of fact and conclusions thereon, so its decision is reviewable only for an abuse of discretion. *Russell v. Russell*, 682 N.E.2d 513, 515 (Ind. 1997). In matters of family law, we adhere to the well-established "preference for granting latitude and deference to our trial judges." *H.H. v. A.A.*, 3 N.E.3d 30, 33 (Ind. Ct. App. 2014) (quoting *In re Marriage of Richardson*, 622 N.E.2d 178, 178 (Ind. 1993)). Unlike appellate courts, trial courts "see[] the parties, observe[] their conduct and demeanor and hear[] their testimony." *In re Paternity of M.W.*, 949 N.E.2d 839, 842 (Ind. Ct. App. 2011). "'Thus enabled to assess credibility and character through both factual testimony and intuitive discernment, our trial judges are in a superior position to ascertain information and apply common sense, particularly in the determination of the best interests of the involved children.'" *H.H.*, 3 N.E.3d at 33 (quoting *Best v. Best*, 941 N.E.2d 499, 502 (Ind. 2011)). Accordingly, we do not reweigh evidence or assess the credibility of

witnesses. *Hughes v. Rogusta*, 830 N.E.2d 898, 902 (Ind. Ct. App. 2005). We will uphold the trial court's custody determination unless "it is clearly against the logic and effect of the facts and circumstances or the reasonable inferences drawn therefrom." *In re Paternity of M.W.*, 949 N.E.2d at 842. "The concern for finality in custody matters reinforces this doctrine." *H.H.*, 3 N.E.3d at 33-34 (quoting *Baxendale v. Raich*, 878 N.E.2d 1252, 1257-58 (Ind. 2008)).

[28] Notwithstanding Father's multiple motions to modify custody, we note that this case arose as a paternity action. While numerous temporary orders concerning custody, support, and parenting time have been entered since the onset of this case, there was never a final order prior to the July 1, 2015 Order currently at issue. Thus, we will rely on the factors set forth in Indiana Code section 31-14-13-2 for making an initial custody decision following the determination of paternity. *See Hughes*, 830 N.E.2d at 901-02.

[29] Once paternity is established, the trial court must "determine custody in accordance with the best interests of the child." Ind. Code § 31-14-13-2 (2015). In making this decision, "there is not a presumption favoring either parent." *Id.* Rather, the court must "consider all relevant factors," including:

> (1) The age and sex of the child.
> (2) The wishes of the child's parents.
> (3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
> (4) The interaction and interrelationship of the child with:
>   (A) the child's parents;
>   (B) the child's siblings; and
>   (C) any other person who may significantly affect the child's

best interest.

(5) The child's adjustment to home, school, and community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a de facto custodian . . . .

*Id.* In an initial custody determination, the trial court must "consider all evidence from the time of [the] Child's birth in determining the custody arrangement that would be in the best interest of [the] Child." *Hughes*, 830 N.E.2d at 902.

[30] Father has neither set forth the applicable statutory factors nor argued that the trial court failed to consider one or more of these required factors in rendering its decision.[6] Rather, he simply asserts that the trial court abused its discretion because it "was provided evidence of [Mother's] mental instability, tendency to lie or exaggerate, and history of refusal to abide by court orders. Furthermore, no facts exist which indicate [Father] to be a poor choice or [Mother] to be a better choice." (Appellant's Br. p. 9). While we agree that certain evidence depicts Mother in a less than favorable light, Father's argument effectively amounts to a request to reweigh the evidence, which we will not do. *See Gilbert v. Gilbert*, 7 N.E.3d 316, 322 (Ind. Ct. App. 2014) ("The trial court must

---

[6] We also note that Father has not challenged the trial court's award of joint *legal* custody. *See* I.C. § 31-14-13-2.3. Therefore, we find that he has waived this issue for appellate review. Ind. Appellate Rule 46(A)(8)(a).

consider each of the statutory factors in making a best interests determination, but it is well within the trial court's discretion to place greater weight on certain evidence and certain factors.").

[31] Father contends that "[a] considerable amount of evidence is related to concerns of [M]other taking [the Child] to the doctor numerous times." (Appellant's Br. p. 11). However, during the final hearing, Father conceded that he did not realize the extent to which the Child's asthma and allergies necessitated visits to the doctor and even the emergency room. In fact, the trial court found that Father "took [the Child] to the doctor as many times since [the Child] has been in [Father's] care as, as [Mother] did just about." (Tr. p. 1052). The evidence establishes that while in Father's custody, between June of 2014 and January of 2015, the Child visited the doctor approximately fourteen times. Moreover, at the start of the final hearing, the parties stipulated to the fact that Mother does not suffer from Munchausen Syndrome by Proxy, so we find Father's reference to any such condition at this point to be inappropriate.

[32] In addition, based on the fact that the trial court admitted Mother's mental health records into evidence, Father infers that "the court took considerable amount of weight [*sic*] into the mental health of all individuals involved." (Appellant's Br. p. 10). As best we can discern, Father appears to argue that the trial court's award of custody to Mother is contrary to the evidence of her mental instability—*i.e.*, her anxiety disorder and a 2009 suicide attempt.

> "The mental and physical health of all individual[s] involved" is
> a relevant factor required to be considered by the statute.

Furthermore in all cases where a parent has some handicap or disability, the trial court must examine the parent's actual and potential physical capabilities, learn how he or she has adapted to the disability and manages its problems. Weighing these and all other relevant factors, a trial court must carefully determine whether the parent's condition will in fact have a substantial and adverse effect on the best interest of the child.

*Hughes*, 830 N.E.2d at 903 (internal citations omitted).

[33] Our court does not presume to second-guess the weight given to any particular best interests factor, and we disagree with Father's assumption that the mental health evidence unequivocally favors him as the custodial parent. At the final hearing, Mother's licensed mental health counselor testified that Mother's anxiety disorder appears to be tied to the custody case. The counselor found that Mother is a good mother and identified no concerns about her ability to parent the Child. The counselor also indicated that Mother seems motivated to cooperate with Father in order for him to be a part of the Child's life:

> Well I said I was excited the times in which she would verbalize, you know I would love to have [Father] part of [the Child's] life . . . . Uh, so those times she would verbalize and it kind of reminded me that she does have, uh, some underlying motivat[ion] . . . she seems like she knows what is best for the [Child] and that being if [Mother] and [Father] could work together and, and figure something out.

(Tr. pp. 653-54).

[34] Father also points out CASA Bowman recommended that Father have primary physical custody. During the final hearing, CASA Bowman testified that

Mother displayed some odd behaviors during her supervised visits with the Child, such as singing loudly in public places. Also, despite Mother's supposed distress over the fact that Father was not feeding the Child her meal supplement, CASA Bowman found it inconsistent that Mother allowed the Child to eat cold hot dogs. CASA Bowman further expressed concern that Mother "seem[s] to treat [the Child] as a peer." (Tr. p. 531). On the other hand, CASA Bowman testified that the Child has more of a routine with Father, and the Child tends to be more talkative and adventurous around him.

[35] The determination of the Child's best interests is left solely to the trial court. *See* I.C. § 31-14-13-2. Although the opinion of a child advocate may, in some cases, carry significant weight with the court, here, we note that CASA Bowman provided the court with contradictory evidence. *See, e.g., Russell*, 682 N.E.2d at 515 (finding an abuse of discretion in granting custody to a father where the child's guardian ad litem and psychologist both recommended that the mother receive custody). For instance, CASA Bowman opined that the non-custodial parent should have more parenting time than recommended by the Guidelines because, at her age, the Child "needs to see both parents throughout the week." (Tr. p. 735). Yet, she also stated, "I'm not sure that either parent deserves this child. She is a fantastic little girl and, uh, I worry about her from, from what I've seen." (Tr. p. 736). Thus, it was well within the trial court's discretion to consider CASA Bowman's recommendation without adopting it.

[36]   In this case, we find that the evidence establishes that both parents love the Child, wish to have her in their custody, and are capable of providing a stable home and meeting the Child's needs. Nevertheless, the majority of the parties' evidence was in conflict, as recognized by the trial court:

> I have two people who have one [Child,] and I've got [Mother] standing on one end on the corner and [Father] standing on the other end of the corner, not just of the street, but of the United States, because not one thing you said is confirmed by anything he said and vice versa. And the only people who know are you because I don't live with you. I mean . . . if you could just agree that the child's name and birth date is the same it would be a starting point.

(Tr. p. 1053). As expressed by our supreme court, "it is particularly difficult for a reviewing court to second-guess a situation that centers on the personalities of two parents battling for control of a child." *Kirk v. Kirk*, 770 N.E.2d 304, 308 (Ind. 2002). The trial court conducted a four-day hearing and reviewed over a thousand pages of evidence in addition to the parties' testimony in rendering its decision, and we must defer to its judgment.

[37]   Finally, Father asserts that Mother's "[c]ontempt, [s]abotage, and [d]eceit" should preclude her from being awarded custody. (Appellant's Br. p. 12). Throughout these proceedings, Father filed numerous contempt motions regarding Mother's violations of the court's orders. We agree that "[c]ourts certainly should not reward parents who refuse to cooperate in the court's efforts to reunify a child with another parent." *Id.* Here, however, the trial court sanctioned Mother's contemptuous behavior by ordering her to pay

$2,500 for Father's attorney fees, and the court chastised Mother about her obligation to obey court orders. While it was within the court's discretion to consider Mother's interference with Father's parenting time in its determination of the Child's best interests, Mother's contempt did not, in itself, obligate the trial court to award custody to Father. Our court has previously found that "lack of cooperation or isolated acts of misconduct by a custodial parent cannot serve as a basis for the modification of child custody" whereas "a parent's egregious violation of a custody order or behavior towards another parent, which places a child's welfare at stake, can support" such a modification. *Hanson v. Spolnik*, 685 N.E.2d 71, 78 (Ind. Ct. App. 1997), *trans denied*. Here, Father does not argue that Mother's actions placed the Child's "mental and physical welfare . . . in jeopardy"; therefore, we decline to say that the trial court abused its discretion by awarding custody of the Child to Mother. *Id.* at 79.

## II. *Due Process: Impartiality*

[38] Next, Father claims that the trial court violated its duty of impartiality by coercing the parties into waiving Indiana Trial Rule 53.2(A) and by exhibiting clear bias against Father. As our court has previously acknowledged, "child custody proceedings implicate the fundamental relationship between parent and child." *Brown v. Brown*, 463 N.E.2d 310, 313 (Ind. Ct. App. 1984). Accordingly, "Indiana courts recognize that procedural due process must be provided to protect the substantive rights of the parties." *Id.* These "paramount" due

process rights include "the right to an unbiased and uncoercive forum." *In re J.K.*, 30 N.E.3d 695, 696 (Ind. 2015).

[39] "Indiana law presumes that a judge is unbiased and unprejudiced." *Everling v. State*, 929 N.E.2d 1281, 1287 (Ind. 2010). "We afford trial judges ample 'latitude to run the courtroom and maintain discipline and control of the trial.'" *In re J.K.*, 30 N.E.3d at 698 (quoting *Timberlake v. State*, 690 N.E.2d 243, 256 (Ind. 1997)). "Particularly in bench trials, courts have considerable discretion to question witnesses sua sponte 'to aid in the fact-finding process as long as it is done in an impartial manner.'" *Id.* (quoting *Taylor v. State*, 530 N.E.2d 1185, 1187 (Ind. 1988)). "In assessing a trial judge's partiality, we examine the judge's actions and demeanor." *Everling*, 929 N.E.2d at 1288. We will "even tolerate a 'crusty' demeanor towards litigants so long as it is applied even-handedly." *In re J.K.*, 30 N.E.3d at 698. Nonetheless, at all times, judges "'must maintain an impartial manner and refrain from acting as an advocate for either party.'" *Id.* at 699 (quoting *Beatty v. State*, 567 N.E.2d 1134, 1136 (Ind. 1991)).

### A. *Indiana Trial Rule 53.2(A)*

[40] First, Father asserts that the trial court coerced the parties into waiving the ninety-day deadline set forth in Indiana Trial Rule 53.2(A). The Rule provides:

> Whenever a cause . . . has been tried to the court and taken under advisement by the judge, and the judge fails to determine any issue of law or fact within ninety (90) days, the submission of all the pending issues and the cause may be withdrawn from the trial

judge and transferred to the Supreme Court for the appointment of a special judge.

Ind. Trial Rule 53.2(A). However, "[t]he time limitation for holding an issue under advisement established under Section (A) of this rule shall not apply where . . . [t]he parties who have appeared or their counsel stipulate or agree on record that the time limitation for decision set forth in this rule shall not apply." T.R. 53.2(B)(1).

[41] It is undisputed that the trial court's July 1, 2015 Order exceeds the ninety-day deadline set forth in Trial Rule 53.2(A). Nevertheless, at the close of the final hearing, the trial court anticipated that it would be unable to render a decision within the prescribed timeframe:

> [COURT:] . . . I'm going to be honest with you, I'm on vacation for a week in April. I'm at a judicial conference for a week in April and I'm on vacation two weeks in May and I have a murder trial coming up for thirty (30) days in June. Do I anticipate having an order done until sometime in July? I don't think it's fair for me to not sift through four hundred pounds of paper work, six boxes and three thousand reams. I need to do that in order to make a learned decision on what is in your child's best interest. I will be honest with you. Neither one of you are going to like what my order is going to be. Now if a miracle of miracles happens and the two of you can get together and come up with an agreement I am all about that. It makes my murder trial go better and my vacation is a lot lighter for me.
> * * * *
> [COURT:] So, uh, everyone is in agreement, they understand that I probably won't even get started on this case until July 15th. Do you all understand that? Do you have any objection to me taking quality time to sift through the forest to make a decision[?]

Because here is the way the rules work. I have ninety (90) days to make a decision. If I don't get it done in ninety (90) days th[e]n you guys can start complaining. Do you agree that you know I'm not even going to get started on it for ninety (90) days[?] Do you agree to that?
[MOTHER:] Yes, your Honor.
[FATHER:] Yes, your Honor.

(Tr. pp. 1060, 1065).

[42] On appeal, Father asserts that the "parties did not have an ability to object to the court's request" because of "the amount of threatening and negative language the [trial court] had presented." (Appellant's Br. p. 16). The negative language to which Father refers includes the trial court's two comments that neither parent deserved to have custody and that the Child would be better off in foster care.[7] Father also cites a remark directed to Mother, in which the trial court stated that it would contact DCS if Mother took the Child to the doctor again. Father further argues that the following comments contributed to the trial court's creation of a hostile environment:

I've got to have a long term, uh, situation for this [Child] because you live in different counties so the school would not be the same. . . . But if you all want to come up with a solution I'm, I'm okay with that. But you guys have got to get over this. You've got to get over the pet dander, the smoking, the I've got diseases but I've made my own diagnosis, I don't have the disease. You

---

[7] The trial court stated that it needed to "figure out what I'm going to do and if I'm going to take the child away from both of you and put her in foster care because that is a real, real though[t] of mine at this time." (Tr. p. 1051).

know, I can't change either one of you even with an order that I do. And, and I'm going to go home and it is not going to [a]ffect me. It is going to [a]ffect [the Child] and how horrible a life she has with, with you two doing what you are doing. I just can't imagine. Because if you don't think she feels the tension and she doesn't overhear the conversations that go on[] between adults you are wrong. Just wait until you are out in public and she mouths something off that you had no idea but it sounds just like she is [parroting] you. Been there, done that. They got ears like radars. And she knows everything that is going on between the two of you. Mark my word, she knows that.
* * * *
Unfortunately, does your mother live next door to [Father's] family? . . . Can we put up a concrete wall? You know, can we drop a bomb and get rid of the whole community so the two people can go in different communities and live. This is ludicrous. How many protective orders do we have, eight, ten, how many do we have?

(Tr. pp. 1061-62). According to Father, "[t]he consistent thickness of negativity bred an atmosphere where a party or attorney could not reasonably be able to make a decision absent of coercion." (Appellant's Br. p. 15).

[43]    In *In re J.K.*, 30 N.E.3d at 701, our supreme court found that the cumulative effect of the trial court's remarks and conduct "breached the court's duty of impartiality and amounted to coercion of [the] [f]ather." There, prior to hearing any evidence, the trial court announced that it would be adjudicating the child as a child in need of services (CHINS). When the father objected, the trial court "persuaded [him] to change his mind" by stating:

If I were you I'd waive fact-finding otherwise you're going to find your butt finding a new job. I'll be happy to give you what you

want sir and I will order custody to you and then you will be responsible for ensuring that [the child] gets to school every day. Do you want to do that? We can play that game.

*Id.* at 700. In addition, the court

> told the parties that their dispute was "ridiculous," "retarded," indicative of "stupidity," "just nuts," and otherwise "not what this [c]ourt is for," and stated that it would "warn" (rather than merely instruct or advise) the appointed mediator. Those remarks strongly suggested to the parties that they would not receive a "fair trial before an impartial judge."

*Id.* Also, after the parties failed to resolve their differences in mediation, the trial court referred to them as "knuckleheads." *Id.*

[44] In the present case, we find nothing in the record to indicate that Father, via his attorney, was coerced into waiving Trial Rule 53.2(A). Rather, it appears that throughout the four-day hearing, the trial court patiently listened to evidence comprising several years' worth of mudslinging and disagreements between the parties. Both parties routinely objected throughout the hearing without fear of reprisal. It was only at the end of the hearing, after all of the evidence had been heard, that the trial court voiced its impatience with the parents' utter refusal to put their animosity aside for the best interests of the Child. Even CASA Bowman commented on the parties' lack of cooperation, stating:

> The parents are difficult. Uh, the story of Solomon in the Bible talks about a child and the true mother would say no don't cut the child in half, let her have it. I, I believe in this case both parents would say okay cut the child in half and then they would

argue whether you cut her in half at the waist or cut her in half from head to toe.

(Tr. p. 735).

[45] Our supreme court has "recognize[d] that judges are not immune from the emotional effects of the cases they hear. . . . Recognizing [their] burden, we will not race to judgment over isolated inappropriate or impatient comments that do not cause prejudice to the parties." *In re J.K.*, 30 N.E.3d at 700 n.1. We find that some of the trial court's comments—specifically, those about foster care and dropping a bomb on the community—were inappropriate. Nonetheless, we do not find that their cumulative effect rises to the level of coercion. *See id.* Contrary to *In re J.K.*, where the trial court announced that it was going to adjudicate the child as a CHINS prior to hearing any evidence, engaged in name-calling, and pressured the father into waiving his right to a hearing, in the case at hand, the trial court heard all of the evidence before asking the parties to waive a procedural, rather than substantive, right. Both parties explicitly agreed to extend the ninety-day deadline in order to give the trial court ample opportunity to thoroughly review all of the evidence before making a final decision. Importantly, Father was not prejudiced by the delay because the trial court kept the Child in his custody pending its final Order. In hindsight, Father regrets his decision to waive Trial Rule 53.2(A) based on his speculation that a different judge would have ruled in his favor. Therefore, we conclude that the trial court did not coerce the parties into waiving Trial Rule 53.2(A).

[46]    Second, Father asserts that the trial court committed fundamental error by exhibiting bias against him. "Recognizing the well-settled due process right to an impartial court as necessary to a fair proceeding, we have found fundamental error when trial judges' comments, demeanor, or conduct indicated bias." *Id.* at 699. In order to overcome the presumption that a trial judge is unbiased and unprejudiced, "the moving party must establish that the judge has personal prejudice for or against a party." *Carter v. Knox Cnty. Office of Family & Children*, 761 N.E.2d 431, 435 (Ind. Ct. App. 2001). "Such bias or prejudice exists only where there is an undisputed claim or the judge has expressed an opinion on the merits of the controversy before him." *Id.* "Adverse rulings and findings by the trial judge do not constitute bias per se." *Id.* Prejudice must be demonstrated by the trial court's conduct; "it cannot be inferred from his subjective views." *Id.*

[47]    Father contends that the following two exchanges with the trial court display the trial court's "unusually particularly negative attitude" and frustration with him. First:

> [COURT]: . . . I really don't know what to say except I should take the child away from both of you. Do you have anything else to present, either one of you?
> [FATHER]: Uh, your Honor, the only thing I have that has a time sensitive matter, taxes are due April 15th. . . . Just from the court order until today there is a three hundred fifty dollars ($350.00) arrears not paid by [Mother]. So [Father] would request even numbered years with [Mother] to get her child support caught up and then to have odd numbered years.

[COURT]: Yeah, let's get another dig in. Let's get another dig in, [Father]. I have no issue with you taking the child, uh, for tax purposes because the child has been with you. So, yeah, you can, you can prepare an order and I will sign that.

* * * *

[COURT]: I've s[a]t here and I have listened to dig after dig after dig and you live [in] another world, [Mother]. I really am, the basis, the original petition was the, the main basis for the modification of custody was because [Father] was concerned about [Mother], uh, taking the child to the doctor so often. . . .

[FATHER]: It was a combination of that and not getting to see his time, your Honor.

[COURT]: And not getting his time. So for a year and a half I've heard every sneeze, every cough, everything that the two of you have done. And you, [Mother], I don't know, I, I can put things in writing, I can reduce them to minutia and you don't get it. In the meantime you have got [Father] over here who is just digging and grinding because that is good for [the Child]. What I am going to do temporarily is I'm going to do away with the monitored visits. You will be getting overnight visitation. You are going to parenting time guidelines overnight visitation. It will start this weekend. I don't want to hear one word out of you, [Father], about well she wasn't there she was at work, I want my right of first refusal. Cause neither one of you are getting first right of refusal until I figure out what I'm going to do and if I'm going to take the child away from both of you and put her in foster care because that is a real, real though[t] of mine at this time. . . . And I, I don't know how to change your psychological make up, [Mother], when you read [a court order] it doesn't click. You need to read it and take it at face value.

* * * *

[COURT]: And, [Father], if I find out you make one phone call, just one and use your position as [a police officer] to send anyone to her house, to contact the DCS, to follow her, if she gets so much as a ticket you are going to be on my radar.

* * * *

[COURT]: Leave her alone. And how dare you, if it's true, how

dare you abuse your authority in such a manner, if it's true.  Now I will tell you [that] you presented into evidence your video or your audio tape.  Making jokes, teeheeing with the people at work about how they may have to come and be a witness for you, hahahaha.  Your audio wasn't real impressive for me but you are the one who put it in so I'm going to consider that when I make . . . my decision.

(Appellant's Br. p. 21); (Tr. pp. 1049-51).  Second:

[COURT]:  So if you would, [Mother] says she has got the cash to give you today [for her share of the Child's daycare], you give her a receipt and then from then on . . . you get a money order or whatever so you can give [it] to [Father] directly.
[MOTHER]:  Yes, your Honor.
[COURT]:  Because you are going to be able to do that in exchange at pick up and so forth.
[MOTHER]:  Yes, your honor.
[FATHER]:  . . . [I]f she prefers she can do it to the daycare, whichever is easiest.
[COURT]:  No, no.
[FATHER]:  Okay.
[COURT]:  No, I'm not involving anybody else.  Here's the deal. I think I just said you are going to have to figure out how you are going to live together for the next seventy-five years.  Have you, did, did that concept sink in with you, [Father]?
[FATHER]:  Yes, your Honor.
[COURT]:  You going to have her pay the school every other week whenever she's a junior in high school?
[FATHER]:  No, your Honor.
[COURT]:  Okay.  Did you not hear me say if you don't have a receipt you didn't pay him[?]
[FATHER]:  Yes.
[COURT]:  So why would that thought even jump into your forefront of your brain?  Why are you involving the daycare?

> You are going to have to change your way of thinking. Just like
> you are. Start today. . . .

(Tr. pp. 1070-71).

[48] As previously stated, a "crusty demeanor" by the trial court will be tolerated "*so long as it is applied even-handedly.*" *In re J.K.*, 30 N.E.3d at 698 (emphasis added). It is clear that, by the end of the final hearing, the trial court had become exasperated by *both* Father and Mother. Throughout the proceedings, the trial court repeatedly instructed the parties that they need to "change [their] way of thinking" in order to effectively cooperate and communicate, but the parties instead clashed over even the minute details of the evidence. (Tr. p. 1071). Ultimately, we find that the trial court expressed its frustration equally with both Father and Mother without exhibiting bias against Father.

[49] Lastly, Father also directs our attention to the trial court's statement, "Neither one of you are going to like what my order is going to be." (Tr. p. 1060). According to Father, "[t]his presumes that [the trial court] either had already made up [its] mind or had a strong indication as to the result." (Appellant's Br. p. 20). We disagree. After making this statement, the trial court ordered Father to retain temporary custody of the Child pending the final Order. The record reveals that the trial court took its responsibility of making a final custody determination very seriously: after a four-day hearing, the trial court informed the parties of its intent to review the evidence so that it could make "a learned decision on what is in your child's best interest." (Tr. p. 1060). Moreover, the trial court made this statement after the parties had presented all of their

evidence, at which point it was appropriate for the trial court to begin formulating a decision based on that evidence. *See, e.g.*, *Ware v. State*, 560 N.E.2d 536, 543 (Ind. Ct. App. 1990) (finding that the trial court's statements during closing arguments did not indicate that the judge had prejudged the case as the evidence had already been presented), *trans. denied*. Accordingly, we conclude that Father has failed to demonstrate that the trial court exhibited bias against him.

## CONCLUSION

Based on the foregoing, we conclude that the trial court acted within its discretion in awarding custody to Mother. We further conclude that the trial court did not violate its duty of impartiality by coercing the parties into waiving the ninety-day deadline set forth in Trial Rule 53.2(A) or by exhibiting bias against Father.

Affirmed.

Najam, J. and May, J. concur