# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 27 2020, 9:17 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ronald K. Smith
Public Defender
Muncie, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of M.R. (Minor Child);

M.R. (Father),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

August 27, 2020

Court of Appeals Case No.
20A-JT-510

Appeal from the Delaware Circuit Court

The Honorable Kimberly S. Dowling, Judge

Trial Court Cause No.
18C02-1905-JT-114

**Pyle, Judge.**

# Statement of the Case

M.R. ("Father") appeals the termination of the parent-child relationship with his daughter, M.R ("M.R."). Father argues that his due process rights were violated because the Department of Child Services ("DCS") failed to make reasonable efforts to preserve the parent-child relationship and that there is insufficient evidence to support the termination. Concluding that DCS did not violate Father's due process rights and that there is sufficient evidence to support the termination, we affirm the trial court's judgment.[1]

We affirm.

# Issues

1. Whether Father's due process rights were violated because DCS failed to make reasonable efforts to preserve the parent-child relationship.

2. Whether there is sufficient evidence to support the termination of the parent-child relationship.

# Facts

The facts most favorable to the termination reveal that Father is the parent of M.R., who was born in February 2016. Following M.R.'s birth, Father, Mother, Mother's two daughters from previous relationships, and M.R. lived

---

[1] We affirmed the termination of M.R.'s mother's ("Mother") parental rights in a companion case handed down contemporaneously with this case. *See Matter of the Involuntary Termination of the Parent-Child Relationship of L.C., F.T., and M.R.*, Appellate Cause Number 20A-JT-533.

with Mother's mother ("Maternal Grandmother") in Maternal Grandmother's house.

[4] DCS removed M.R. and Mother's other children from their parents in October 2016 because of the parents' drug use. Father was using suboxone without a prescription, and Mother admitted that she had been using morphine, heroin, pain medication, and THC. M.R. and her older sisters were placed together in foster care. Father admitted that M.R. was a Child in Need of Services ("CHINS") in late October 2016.

[5] In January 2017, Father was arrested for a domestic violence incident involving Mother. He was incarcerated until March 2017. Also in March 2017, the trial court issued a CHINS dispositional order. The trial court's order required Father to: (1) participate in all DCS-referred programs; (2) attend visitation with M.R.; (3) abstain from the use of illegal substances; (4) submit to random drug screens; (5) maintain suitable, safe, and stable housing; and (6) secure and maintain a legal and stable source of income. DCS later referred Father to a homebased case management program. DCS also referred Father to a homemaker parent-aide who could assist the then fifty-six-year-old first-time Father with parenting skills during visitation. The plan for Father and M.R. was reunification.

[6] Father had sporadic visits with M.R. from March 2017 through May 2018. During this time, Father was incarcerated for five months because he had

violated his probation. Also during this time, Father told the DCS case worker that his home was not an appropriate location for visitation with M.R.

[7] In May 2018, Father moved into appropriate housing, and, in June 2018, Father's visits with M.R. increased to three times per week. In October 2018, Father began to have unsupervised and overnight visitation with M.R.

[8] In November 2018, Father tested positive for methamphetamine. A DCS case worker went to Father's home to discuss the positive results with him and to check on M.R., who was at Father's home for an unsupervised visit. When the case worker arrived at Father's home, she discovered that Mother was also at the home. Both parents had been told at a previous hearing that Mother was not allowed to be in Father's home while M.R. was visiting. The case worker asked Mother to leave and told Father that if the case worker discovered Mother in the home during another unsupervised visit, DCS would end Father's unsupervised visitation.

[9] Four days later, the case worker returned to Father's home and found Mother hiding in a closet. There was another young woman lying on M.R.'s bed. The case worker ended the visit and returned M.R. to her foster family. Shortly thereafter, the trial court granted DCS' motion to return Father to supervised visitation with M.R.

[10] During the course of Father's subsequent supervised visits with M.R., one visitation facilitator became concerned that Father did not realize that parenting is "a full[-]time job." (Tr. Vol. 2 at 210). For example, when M.R. became ill

during a supervised visit, Father asked the visitation facilitator to return her to her foster parents. Another visitation facilitator noticed that Father had allowed M.R. to spend "eighty-five-percent (85%) of the visit" on her iPad. (Tr. Vol. 2 at 20).

[11] Father tested positive for methamphetamine in January and April 2019. In May 2019, DCS filed a petition to terminate the parental relationship between Father and M.R. In July 2019, M.R. became upset when Father failed to attend a scheduled visit. Father failed to attend additional scheduled visits in July 2019 and subsequently tested positive for methamphetamine again that month. Father also failed to attend all of his scheduled visits in August 2019.

[12] The trial court held a two-day termination factfinding hearing in August and November 2019. Testimony at the hearing detailed Father's history of substance abuse, including his positive screens for methamphetamine in January, April, and July 2019. Testimony at the termination hearing also revealed that, in September 2019, DCS had reduced Father's visits with M.R. from three times a week to two times a week. A visitation facilitator explained that DCS had reduced Father's visits because M.R. "was having a hard time transitioning when visits would not occur." (Tr. Vol. 2 at 204). M.R.'s difficult transition was apparently due to Father's failure to attend multiple visits with M.R. in July and August 2019.

[13] In addition, the testimony at the termination hearing revealed that throughout the course of the CHINS proceeding, Father had expressed concerns about his

ability to care for M.R. on a permanent, full-time basis and had told visitation facilitators and the DCS case manager that he wanted M.R. to stay with her foster parents. Father "thought [the foster parents] did a very good job raising the [three girls] and he was thankful [the sisters] could stay together." (Tr. Vol. 2 at 202). However, Father wanted to be able to continue weekly visits with M.R.

[14] At the termination hearing, when asked what he "want[ed] as far as [his] future with [M.R.]," Father asked the trial court to allow Mother another six months to a year "to prove herself." (Tr. Vol. 2 at 202). Father further explained as follows:

> Well I hate to say this wrong because you got on my butt a while back. But I tried to do a post agreement with the foster parents. And they, they only wanted to give me two (2) times a year with my daughter . . . at an hour at a time at their discretion. And it was like a smack in the face because [foster father] told me that he would never deny me of seeing my daughter. And when I put this post agreement in, it was like a smack in the face, like I've been lied to. And I hate to say it like this but now I want to watch my daughter grow up. I want to watch her grow up. . . . I love my daughter and it's the only one I've got. And please let me have more visits with her.

(Tr. Vol. 2 at 221-22).

[15] In February 2020, the trial court issued a detailed order terminating Father's parental relationship with M.R. Father now appeals.

# Decision

Father argues that his due process rights were violated because DCS failed to make reasonable efforts to preserve the parent-child relationship and that there is insufficient evidence to support the termination. We address each of his contentions in turn.

## 1. Reasonable Efforts and Due Process

Father argues that DCS failed to make reasonable efforts to preserve the parent-child relationship, resulting in a violation of his due process rights. When DCS seeks to terminate parental rights, "it must do so in a manner that meets the prerequisites of due process." *In re J.K.*, 30 N.E.3d 695, 699 (Ind. 2015) (quotations and citations omitted). Whether due process has been afforded in termination proceedings is determined by balancing the following "three distinct factors" specified in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976): (1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing governmental interest supporting use of the challenged procedure. *A.P. v. Porter Cnty. Office of Family and Children*, 734 N.E.2d 1107, 1112 (Ind. Ct. App. 2000), *trans. denied*.

In *S.L. v. Ind. Dep't of Child Servs.*, 997 N.E.2d 1114, 1120 (Ind. Ct. App. 2013) (citing *In re C.G.*, 954 N.E.2d 910, 917 (Ind. 2011)), this Court further explained the *Mathews* factors as follows:

> The private interest affected by the proceeding is substantial – a
> parent's interest in the care, custody, and control of his or her

child. And the State's interest in protecting the welfare of a child is also substantial. Because the State and the parent have substantial interests affected by the proceeding, we focus on the risk of error created by DCS's actions and the trial court's actions.

[19] DCS must "make reasonable efforts to preserve and reunify families." IND. CODE § 31-34-21-5.5(b). In addition, "due process protections at all stages of CHINS proceedings are vital because every CHINS proceeding has the potential to interfere with the rights of parents in the upbringing of their children." *In re G.P.*, 4 N.E.3d 1158, 1165 (Ind. 2014) (quotations and citations omitted). "[T]hese two proceedings - CHINS and TPR - are deeply and obviously intertwined to the extent that an error in the former may flow into and infect the latter[.]" *Id.*

[20] However, the "failure to provide services does not serve as a basis on which to directly attack a termination order as contrary to law." *In re H.L.*, 915 N.E.2d 145, 148 n.3 (Ind. Ct. App. 2009); *see also In re E.E.*, 736 N.E.2d 791, 796 (Ind. Ct. App. 2000) ("[T]he provision of family services is not a requisite element of our parental rights termination statute, and thus, even a complete failure to provide services would not serve to negate a necessary element of the termination statue and require reversal."). Further, a parent may not sit idly by without asserting a need or desire for services and then successfully argue that he or she was denied services to assist him or her with his or her parenting. *In re B.D.J.*, 728 N.E.2d 195, 201 (Ind. Ct. App. 2000).

[21]     Here, Father appears to argue that DCS failed to make reasonable efforts to preserve the parent-child relationship because, in September 2019, it reduced his visitation with M.S. from three times a week to twice a week. As a preliminary matter, we note that the law is well established that a party on appeal may waive a constitutional claim. *McBride v. Monroe Cnty. Office of Family and Children*, 798 N.E.2d 185, 194 (Ind. Ct. App. 2003). For example, in *In re K.S.,* 750 N.E.2d 832, 834 n.1 (Ind. Ct. App. 2001), this Court determined that a mother had waived her claim that the trial court had violated her due process rights because she raised the constitutional claim for the first time on appeal.

[22]     Father in this case did not object to any alleged deficiencies in the CHINS process during the CHINS proceedings, nor did he argue during the termination proceedings that those alleged deficiencies constituted a due process violation. Rather, Father has raised his due process claim for the first time on appeal. He has therefore waived appellate review of this issue. *See id*.

[23]     Waiver notwithstanding, our review of the record reveals that DCS offered Father the following services when the trial court issued the CHINS dispositional order in M.R.'s case: (1) drug screens; and (2) both supervised and unsupervised visits with M.R. DCS later referred Father to a homebased case management program. DCS also referred Father to a homemaker parent-aide who could assist the then fifty-six-year-old first-time Father with parenting skills during visitation. DCS provided these services to Father in an attempt to reunify him with M.R.

Father failed to attend several visits with M.R. in July and August 2019. Thereafter, in September 2019, DCS reduced Father's visits with M.R. from three times a week to twice a week because M.R. "was having a hard time transitioning when visits would not occur." (Tr. Vol. 2 at 204). Based on the foregoing, Father has not established that his due process rights were violated.[2]

## 2. Sufficiency of the Evidence

Father also argues that there is insufficient evidence to support the termination of his parental relationship with M.R. The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment to the United States Constitution. *In re J.W., Jr.*, 27 N.E.3d 1185, 1187-88 (Ind. Ct. App. 2015), *trans. denied*. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. *Id.* at 1188. Termination of the parent-child relationship is proper where a child's emotional and physical development is threatened. *Id.* Although the right to raise one's own child should not be terminated solely because there is a better home available for the

---

[2] We further note that Father has not established that DCS engaged in conduct that adversely affected his ability to participate in and complete services aimed at reunifying him with M.R. *Cf. In re T.W.*, 135 N.E.3d 607, 618 (Ind. Ct. App. 2019) (concluding that the "insufficient process employed in the CHINS case created a risk of the erroneous filing of a petition to terminate Father's parental rights to [his child], in violation of Father's due process rights.") *trans. denied*; *Matter of C.M.S.T.*, 111 N.E.3d 207, 213 (Ind. Ct. App. 2018) (concluding that "the chaotic and unprofessional handling" of a CHINS case violated the parents' due process rights, requiring reversal of the termination order); *A.P.*, 734 N.E.2d at 1117 (finding parents' due process rights were violated in a termination proceeding where DCS made multiple procedural errors, such as failing to provide parents with copies of case plans and filing CHINS and termination petitions that did not meet statutory requirements).

child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.*

[26] Before an involuntary termination of parental rights may occur, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

IND. CODE § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *K.T.K. v. Ind. Dep't of Child Servs.,* 989 N.E.2d 1225, 1230 (Ind. 2013).

[27] When reviewing a termination of parental rights, this Court will not reweigh the evidence or judge the credibility of the witnesses. *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016). We consider only the evidence and any reasonable inferences to be drawn therefrom that support the judgment and give due regard to the

trial court's opportunity to judge the credibility of the witnesses firsthand. *K.T.K.*, 989 N.E.2d at 1229.

[28] We further note that, in determining whether to terminate a parent-child relationship, trial courts have discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination and may find that a parent's past behavior is the best predictor of future behavior. *D.B.M. v. Ind. Dep't of Child Services*, 20 N.E.3d 174, 181-82 (Ind. Ct. App. 2014), *trans. denied*. We have also stated that the time for a parent to rehabilitate himself or herself is during the CHINS process, before DCS files a termination petition. *Prince v. Dep't of Child Services*, 861 N.E.2d 1223, 1230 (Ind. Ct. App. 2007).

[29] In addition, as a general rule, appellate courts grant latitude and deference to trial courts in family law matters. *Matter of D.P.*, 72 N.E.3d 976, 980 (Ind. Ct. App. 2017). "This deference recognizes a trial court's unique ability to see the witnesses, observe their demeanor, and scrutinize their testimony, as opposed to this court[] only being able to review a cold transcript of the record." *Id.*

[30] Here, Father appears to argue that: (1) there is a reasonable probability that the conditions that resulted in M.R.'s removal or the reasons for her placement outside the home will not be remedied; and (2) a continuation of the parent-child relationship poses a threat to M.R.'s well-being.

[31] However, we note that INDIANA CODE § 31-35-2-4(b)(2)(B) is written in the disjunctive. Therefore, DCS is required to establish by clear and convincing evidence only one of the three requirements of subsection (B). *In re A.K.,* 924

N.E.3d 212, 220 (Ind. Ct. App. 2010), *trans. dismissed*. We therefore discuss only whether there is a reasonable probability that the conditions that resulted in M.R.'s removal or the reasons for her placement outside the home will not be remedied.

[32] In determining whether the conditions that resulted in a child's removal or placement outside the home will not be remedied, we engage in a two-step analysis. *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014). We first identify the conditions that led to removal or placement outside the home and then determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* The second step requires a trial court to judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing any recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* Habitual conduct may include a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and a lack of adequate housing and employment. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*. The trial court may also consider services offered to the parent by DCS and the parent's response to those services as evidence of whether conditions will be remedied. *Id.* Requiring a trial court to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of his future behavior. *E.M.*, 4 N.E.3d at 643.

[33]     Here, our review of the evidence reveals that M.R. was removed from Father because of his drug use. During the course of the CHINS proceedings, Father tested positive for methamphetamine multiple times, including one time after the termination petition had been filed. We further note that throughout the CHINS proceedings, Father often told service providers that he was concerned about his ability to care for M.R. on a permanent, full-time basis and that he wanted M.R. to stay with her foster family because they did "a very good job raising [M.R. and her sisters]." (Tr. Vol. 2 at 202). Father had apparently even been willing to allow foster parents to adopt M.R. until he learned that he would not be able to continue his weekly visits with her. This evidence supports the trial court's conclusion that there is a reasonable probability that the conditions that resulted in M.R.'s removal or the reasons for placement outside her home will not be remedied.

[34]     We reverse a termination of parental rights "only upon a showing of 'clear error'—that which leaves us with a definite and firm conviction that a mistake has been made." *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992). We find no such error here and therefore affirm the trial court.

[35]     Affirmed.

Kirsch, J., and Tavitas, J., concur.