## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 27 2020, 9:23 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ana M. Quirk
Muncie, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Marjorie Lawyer-Smith
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re: The Termination of the Parent-Child Relationship of L.C., F.T., and M.R. (Minor Children);

S.C. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

August 27, 2020

Court of Appeals Case No.
20A-JT-533

Appeal from the Delaware Circuit Court

The Honorable Kimberly S. Dowling, Judge
The Honorable Amanda Yonally, Juvenile Magistrate

Trial Court Cause Nos.
18C02-1905-JT-112
18C02-1905-JT-113
18C02-1905-JT-114

**Pyle, Judge.**

# Statement of the Case

S.C. ("Mother") appeals the termination of the parent-child relationships with her daughters, L.C. ("L.C."), F.T. ("F.T."), and M.R ("M.R.") (collectively "the children"). Mother argues that her due process rights were violated because the Department of Child Services ("DCS") failed to make reasonable efforts to preserve the parent-child relationships and that there is insufficient evidence to support the terminations. Concluding that DCS did not violate Mother's due process rights and that there is sufficient evidence to support the terminations, we affirm the trial court's judgment.[1]

We affirm.

# Issues

1. Whether Mother's due process rights were violated because DCS failed to make reasonable efforts to preserve her parent-child relationships with the children.

2. Whether there is sufficient evidence to support the termination of the parent-child relationships.

# Facts

The facts most favorable to the termination reveal that Mother is the parent of L.C., who was born in July 2008; F.T., who was born in August 2011; and

---

[1] L.C.'s father is deceased, and F.T.'s father's parental rights were terminated in an unrelated proceeding. We affirmed the termination of M.R.'s father's ("M.R.'s Father") parental relationship with M.R. in a companion case handed down contemporaneously with this case. *See In the Matter of the Involuntary Termination of the Parent-Child Relationship of M.R.*, Appellate Cause Number 20A-JT-510.

M.R., who was born in February 2016. In February 2015, L.C. and F.T. were under the guardianship of maternal grandmother ("Maternal Grandmother"). In February 2016, the trial court adjudicated the two girls to be children in need of services ("CHINS") because Maternal Grandmother was allowing Mother, who was using illegal drugs, to have unsupervised contact with the children in violation of the guardianship order. L.C. and F.T. were returned to Mother in March 2016, and the CHINS case was later closed.

[4] Following L.C.'s and F.T.'s return to Mother and M.R.'s birth, Mother, M.R.'s Father, and the children lived with Maternal Grandmother at Maternal Grandmother's house. DCS removed the children in October 2016 because of Mother's and M.R.'s Father's drug use. DCS placed the children in foster care. Mother admitted that she had been using morphine, heroin, pain medication and THC, and M.R.'s Father was using suboxone without a prescription. The trial court adjudicated the children to be CHINS in October 2016.

[5] Mother, who had been unsuccessfully discharged from a Meridian Health Services ("Meridian") outpatient substance abuse program in April 2016, began an inpatient detoxification and treatment program in November 2016. After she had successfully completed the program, DCS referred her to an intensive outpatient substance abuse program at Meridian in November 2016.

[6] In March 2017, the trial court issued a CHINS dispositional order. The trial court's order required Mother to: (1) participate in DCS-referred programs; (2) participate in substance abuse therapy; (3) successfully complete the addiction

services recommended by Meridian; (4) attend visitation with the children; (5) abstain from the use of illegal substances; (6) submit to random drug screens; (7) maintain suitable, safe, and stable housing; and (8) secure and maintain a legal and stable source of income. The plan for Mother and the children was reunification.

[7] After the trial court issued the dispositional order, Mother began attending the intensive outpatient program at Meridian. However, three weeks later, the outpatient program therapist removed Mother from the program because Mother had continued to use illegal substances.

[8] Two months later, in May 2017, DCS referred Mother to individual substance abuse counseling and an intensive outpatient program, both at Centerstone ("Centerstone"). Mother sporadically participated in both programs until August 2018. During that time, Mother continued to use illegal substances. When other patients in the outpatient program reported that Mother was "trying to sell or share substances," Mother was unsuccessfully discharged from the outpatient program. (Tr. Vol. 2 at 42). Although Mother's therapist offered her the opportunity to continue in individual therapy, she chose not to return to Centerstone.

[9] In early 2019, DCS referred Mother back to Meridian for substance abuse services, and Mother participated in another intensive outpatient program. In March 2019, Mother was suspended from the program because she was using

methamphetamine. Mother did not attend a meeting to discuss reinstatement to the program and continued to test positive for methamphetamine.

[10] In April 2019, the trial court issued an order "absolv[ing] [DCS] of any responsibility for providing any reunification services to [Mother]." (Tr. Vol. 2 at 160). In May 2019, DCS filed a petition to terminate the parental relationships between Mother and the children.

[11] The trial court held a two-day factfinding hearing in August and November 2019. Testimony at the hearing detailed Mother's history of substance abuse and her more than three-year history of failed attempts at substance abuse treatment. Between 2016 and August 2019, Mother had sixty-six positive drug screens for illegal substances, including positive screens for methamphetamine in June and July 2019 after DCS had filed the termination petition.

[12] In addition, the testimony revealed that Mother had never progressed to unsupervised visitation with the children during the course of the proceedings. In early 2019, L.C. told the DCS case manager, the CASA, her therapist, and her foster parents that she no longer wanted to attend visits with Mother. Thereafter, L.C. was allowed to decide whether she would attend visits with Mother and she never attended another one. By May 2019, F.T. "was getting unstable and not wanting to go to visits [with Mother] anymore." (Tr. Vol. 2 at 98). During visits, F.T. was angry with Mother for using drugs. Neither F.T. nor M.R. wanted to hug or kiss Mother, and F.T. stated that she wanted to live with her foster parents. The visitation supervisor specifically described the

relationship between F.T. and Mother as "broken." (Tr. Vol. 2 at 96). During a June 2019 visit, the visitation supervisor suspected that Mother was under the influence of drugs and told the DCS family case manager about her suspicion. The DCS case manager asked Mother to take a drug test, which was positive for methamphetamine.

[13] The testimony at the termination hearing also revealed that the children were thriving in foster care. Foster parents had taken the two oldest girls, eleven-year-old L.C. and eight-year-old F.T. to a mental health therapist without waiting for a referral from DCS. L.C. suffered from the trauma of Mother's drug use and had memories of Mother choking her while Mother was intoxicated. F.T. scratched herself, had temper tantrums, bit her fingernails, and put her hands down her pants. The therapist was working with F.T. to develop healthy coping skills and to manage trauma triggers. The therapist observed that the interactions between the children and their foster parents were positive and that the foster parents were very supportive of the children. The therapist specifically testified that she had seen "nothing but good" with respect to the foster parents. (Tr. Vol. 2 at 31). The plan for the children was foster parent adoption.

[14] At the second day of the termination hearing in November 2019, Mother testified that she had been living in a house with her former stepfather and had been working for the previous four months. She had a full-time job as a gas station attendant and a part-time job as a secretary. Mother had also been taking methadone for four months and participating in treatment at a

methadone clinic. Additionally, Maternal Grandmother testified that it was not in the children's best interests to terminate Mother's parental rights.

[15] In February 2020, the trial court issued three detailed orders terminating Mother's parental relationships with the children. Mother now appeals the terminations.

# Decision

[16] Mother argues that her due process rights were violated because DCS failed to make reasonable efforts to preserve the parent-child relationships and that there is insufficient evidence to support the terminations. We address each of her contentions in turn.

## 1. Reasonable Efforts and Due Process

[17] Mother argues that DCS failed to make reasonable efforts to preserve the parent-child relationships, resulting in a violation of her due process rights. When DCS seeks to terminate parental rights, "it must do so in a manner that meets the prerequisites of due process." *In re J.K.*, 30 N.E.3d 695, 699 (Ind. 2015) (quotations and citations omitted). Whether due process has been afforded in termination proceedings is determined by balancing the following "three distinct factors" specified in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976): (1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing governmental interest supporting use of the challenged procedure. *A.P. v. Porter*

*Cnty. Office of Family and Children*, 734 N.E.2d 1107, 1112 (Ind. Ct. App. 2000), *trans. denied*.

[18]   In *S.L. v. Ind. Dep't of Child Servs.*, 997 N.E.2d 1114, 1120 (Ind. Ct. App. 2013) (citing *In re C.G.*, 954 N.E.2d 910, 917 (Ind. 2011)), this Court further explained the *Mathews* factors as follows:

> The private interest affected by the proceeding is substantial – a parent's interest in the care, custody, and control of his or her child. And the State's interest in protecting the welfare of a child is also substantial. Because the State and the parent have substantial interests affected by the proceeding, we focus on the risk of error created by DCS's actions and the trial court's actions.

[19]   DCS must "make reasonable efforts to preserve and reunify families." IND. CODE § 31-34-21-5.5(b). In addition, "due process protections at all stages of CHINS proceedings are vital because every CHINS proceeding has the potential to interfere with the rights of parents in the upbringing of their children." *In re G.P.*, 4 N.E.3d 1158, 1165 (Ind. 2014) (quotations and citations omitted). "[T]hese two proceedings - CHINS and TPR - are deeply and obviously intertwined to the extent that an error in the former may flow into and infect the latter[.]" *Id.*

[20]   However, the "failure to provide services does not serve as a basis on which to directly attack a termination order as contrary to law." *In re H.L.*, 915 N.E.2d 145, 148 n.3 (Ind. Ct. App. 2009); *see also In re E.E.*, 736 N.E.2d 791, 796 (Ind. Ct. App. 2000) ("[T]he provision of family services is not a requisite element of

our parental rights termination statute, and thus, even a complete failure to provide services would not serve to negate a necessary element of the termination statue and require reversal."). Further, a parent may not sit idly by without asserting a need or desire for services and then successfully argue that he or she was denied services to assist him or her with his or her parenting. *In re B.D.J.*, 728 N.E.2d 195, 201 (Ind. Ct. App. 2000).

[21] Here, Mother appears to argue that DCS failed to make reasonable efforts to preserve the parent-child relationships because it did not provide her with any services after April 2019. As a preliminary matter, we note that the law is well established that a party on appeal may waive a constitutional claim. *McBride v. Monroe Cnty. Office of Family and Children*, 798 N.E.2d 185, 194 (Ind. Ct. App. 2003). For example, in *In re K.S.,* 750 N.E.2d 832, 834 n.1 (Ind. Ct. App. 2001), this Court determined that a mother had waived her claim that the trial court had violated her due process rights because she raised the constitutional claim for the first time on appeal.

[22] Mother in this case did not object to any alleged deficiencies in the CHINS process during the CHINS proceedings, nor did she argue during the termination proceedings that those alleged deficiencies constituted a due process violation. Rather, Mother has raised her due process claim for the first time on appeal. She has therefore waived appellate review of this issue. *See id*.

[23] Waiver notwithstanding, our review of the record reveals that DCS offered Mother the following services for more than three years: (1) multiple substance

abuse treatment referrals, including at least one referral to an inpatient treatment program and at least four referrals to outpatient treatment programs; (2) drug screens; and (3) supervised visitation with the children. DCS offered Mother these services with a plan for family reunification. Three years later, after Mother had failed to successfully complete the outpatient substance abuse treatment programs and had continued to test positive for illegal drugs, DCS stopped providing services to Mother and changed the plan for the children to foster parent adoption. DCS offered Mother sufficient services in its attempt to preserve and reunify Mother's family. Based on the foregoing, Mother has not established that her due process rights were violated.[2]

## 2. Sufficiency of the Evidence

[24]     Mother also argues that there is insufficient evidence to support the termination of her parental relationships with the children. The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment to the United States Constitution. *In re J.W., Jr.*, 27 N.E.3d 1185, 1187-88 (Ind. Ct. App. 2015), *trans. denied*. However, a trial court must

---

[2] We further note that Mother has not established that DCS engaged in conduct that adversely affected her ability to participate in and complete services aimed at reunifying her with her daughters. *Cf. In re T.W.*, 135 N.E.3d 607, 618 (Ind Ct. App. 2019) (concluding that the "insufficient process employed in the CHINS case created a risk of the erroneous filing of a petition to terminate Father's parental rights to [his child], in violation of Father's due process rights."), *trans. denied*; *Matter of C.M.S.T.*, 111 N.E.3d 207, 213 (Ind. Ct. App. 2018) (concluding that "the chaotic and unprofessional handling" of a CHINS case violated the parents' due process rights, requiring reversal of the termination order); *A.P.*, 734 N.E.2d at 1117 (finding parents' due process rights were violated in a termination proceeding where DCS made multiple procedural errors, such as failing to provide parents with copies of case plans and filing CHINS and termination petitions that did not meet statutory requirements).

subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. *Id.* at 1188. Termination of the parent-child relationship is proper where a child's emotional and physical development is threatened. *Id.* Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.*

[25] Before an involuntary termination of parental rights may occur, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

IND. CODE § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *K.T.K. v. Ind. Dep't of Child Servs.,* 989 N.E.2d 1225, 1230 (Ind. 2013).

[26]    When reviewing a termination of parental rights, this Court will not reweigh the evidence or judge the credibility of the witnesses. *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016). We consider only the evidence and any reasonable inferences to be drawn therefrom that support the judgment and give due regard to the trial court's opportunity to judge the credibility of the witnesses firsthand. *K.T.K.*, 989 N.E.2d at 1229.

[27]    We further note that, in determining whether to terminate a parent-child relationship, trial courts have discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination and may find that a parent's past behavior is the best predictor of future behavior. *D.B.M. v. Ind. Dep't of Child Services*, 20 N.E.3d 174, 181-82 (Ind. Ct. App. 2014), *trans. denied*. We have also stated that the time for a parent to rehabilitate himself or herself is during the CHINS process, before DCS files a termination petition. *Prince v. Dep't of Child Services*, 861 N.E.2d 1223, 1230 (Ind. Ct. App. 2007).

[28]    In addition, as a general rule, appellate courts grant latitude and deference to trial courts in family law matters. *Matter of D.P.*, 72 N.E.3d 976, 980 (Ind. Ct. App. 2017). "This deference recognizes a trial court's unique ability to see the witnesses, observe their demeanor, and scrutinize their testimony, as opposed to this court[] only being able to review a cold transcript of the record." *Id.*

[29]    Here, Mother first argues that DCS has failed to prove by clear and convincing evidence that: (1) there is a reasonable probability that the conditions that resulted in the children's removal or the reasons for their placement outside the

home will not be remedied; and (2) a continuation of the parent-child relationships poses a threat to the children's well-being.

[30] However, we note that INDIANA CODE § 31-35-2-4(b)(2)(B) is written in the disjunctive. Therefore, DCS is required to establish by clear and convincing evidence only one of the three requirements of subsection (B). *In re A.K.,* 924 N.E.3d 212, 220 (Ind. Ct. App. 2010), *trans. dismissed.* We therefore discuss only whether there is a reasonable probability that the conditions that resulted in the children's removal or the reasons for their placement outside the home will not be remedied.

[31] In determining whether the conditions that resulted in a child's removal or placement outside the home will not be remedied, we engage in a two-step analysis. *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014). We first identify the conditions that led to removal or placement outside the home and then determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* The second step requires a trial court to judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing any recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* Habitual conduct may include a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and a lack of adequate housing and employment. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied.* The trial court may also consider services offered to the parent by

DCS and the parent's response to those services as evidence of whether conditions will be remedied. *Id.* Requiring a trial court to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of his or her future behavior. *E.M.*, 4 N.E.3d at 643.

[32] Here, our review of the evidence reveals that the children were removed from Mother because of her drug use. During the three-year pendency of the CHINS proceedings, Mother was unsuccessfully discharged from at least four outpatient substance abuse treatment programs and continued to use drugs. After DCS filed the termination petition, Mother attended a supervised visitation with F.T. and M.R. while under the influence of methamphetamine. This evidence supports the trial court's conclusion that there is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home will not be remedied.

[33] Mother also argues that DCS failed to prove by clear and convincing evidence that termination was in the children's best interests. In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look at the totality of the evidence. *In re D.D.*, 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*. In so doing, the court must subordinate the interests of the parents to those of the child involved. *Id.* Termination of the parent-child relationship is proper where the child's emotional and physical development is threatened. *In re R.S.*, 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied*. The trial court need not wait until the child is irreversibly

harmed such that her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *In re E.S.* 767 N.E.2d 1287, 1290 (Ind. Ct. App. 2002). In addition, a child's need for permanency is a central consideration in determining the child's best interests. *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009).

[34] Here, the entirety of Mother's argument on this issue is that "there was no evidence presented by DCS that the termination of the parent-child relationship was in the best interest of the minor children. [Maternal Grandmother] testified that it was not in their best interest to have the relationship terminated." (Mother's Br. 19). Mother has waived appellate review of this issue because she has failed to support it with cogent argument and relevant authority. *See Kentucky Nat'l. Ins. Co. v. Empire Fire and Marine Ins. Co.*, 919 N.E.2d 565, 598 (Ind. Ct. App. 2010) (holding that argument was waived for failure to cite authority or provide cogent argument).

[35] Waiver notwithstanding, our review of the evidence reveals that the children have been thriving in their pre-adoptive foster home for three years, and the two oldest children no longer want to attend visitation with Mother. This evidence, as well as the other evidence previously discussed, supports the trial court's conclusion that termination was in the children's best interests.

[36] We reverse a termination of parental rights "only upon a showing of 'clear error'—that which leaves us with a definite and firm conviction that a mistake has been made." *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232,

1235 (Ind. 1992). We find no such error here and therefore affirm the trial court.

Affirmed.

Kirsch, J. and Tavitas, J., concur.