## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 28 2020, 8:48 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

| ATTORNEYS FOR APPELLANTS | ATTORNEYS FOR APPELLEE |
|---|---|
| Devon M. Sharpe<br>Madison, Indiana | Curtis T. Hill, Jr.<br>Attorney General of Indiana |
| Lisa Manning<br>Danville, Indiana | Robert J. Henke<br>Deputy Attorney General<br>Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the Parent-Child Relationship of:

D.W. (Minor Child)

and

A.H. (Mother) & D.W.(Father),

*Appellants-Respondents,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

October 28, 2020

Court of Appeals Case No. 20A-JT-875

Appeal from the Jefferson Circuit Court

The Honorable Donald J. Mote, Judge

The Honorable Carl H. Taul, Special Judge

Trial Court Cause No. 39C01-1907-JT-12

**Altice, Judge.**

# Case Summary

A.H. (Mother) and D.W. (Father) separately appeal from the involuntary termination of their parental rights to their minor son. On appeal, Mother and Father both argue that the trial court erred in denying their oral motion to dismiss the termination petition. Mother separately argues that the trial court abused its discretion in admitting evidence of her drug test results under Ind. Evidence Rule 803(b), the business records exception to the hearsay rule. Father separately argues that the evidence is insufficient to support the trial court's termination order as to him.

We affirm.

# Facts & Procedural History

Mother and Father are the biological parents of Do.W. (Child), born April 2, 2018. On September 12, 2018, Mother had a "mental health crisis" while she and Child were at a local store. *Transcript Vol. II* at 43. Mother refused treatment. DCS checked Mother's home and deemed it suitable and safe, so DCS did not intervene further. The next day, Mother was in the parking lot of the apartment building where she was staying and was incoherent and acting erratically, believing that someone was trying to kill her and Child. After determining that there was no such threat to Mother and Child's safety, officers transported Mother to the hospital where Mother admitted to using methamphetamine. She was later admitted to Bloomington Meadows for psychiatric treatment. At the time, Father was incarcerated on a bestiality

conviction. Because there were no suitable, able, and willing caregivers, DCS placed Child in foster care, where he has remained.

[4] On September 14, 2018, DCS filed a child in need of services (CHINS) petition. Mother failed to appear for the CHINS factfinding hearing, and Child was adjudicated a CHINS on November 15, 2018. At a subsequent factfinding hearing on December 6, 2018, Father admitted Child was a CHINS. The court entered a dispositional order on December 13, 2018. Mother and Father were ordered to maintain contact with the family case manager (FCM), maintain stable, safe, and suitable housing, secure and maintain a legal source of income, complete a parenting assessment and follow all recommendations, complete a psychological evaluation and follow all recommendations, participate in recommended home-based services, and attend supervised visits with Child. Mother was additionally ordered to submit to a substance abuse assessment and random drug screens.

[5] After Child was removed from Mother's care, DCS arranged for supervised visitation. Mother visited Child one time, on October 10, 2018. At some point thereafter, Mother was arrested. After her release from jail in January 2019, Mother fell off DCS's radar. DCS contacted family and friends and used an investigator but was unable to locate Mother, who was apparently bouncing between houses and living on the streets until July 1, 2019, when she was again arrested. While incarcerated, DCS did not offer services to Mother.

[6] During the time when Mother's whereabouts were unknown, DCS briefly worked with Father after he was released from incarceration in February 2019. Father completed a psychological evaluation with Peter Davies, a therapist at Centerstone. Davies found Father to be "responsive [and] engaged" and "open and honest." *Id*. at 56, 59. Father informed Davies about his criminal history and violent behavior, explaining that he "head-butted a person" during an altercation and would get into fights in jail. *Id*. at 59. Father also told Davies about his conviction for bestiality, but, according to Davies, Father denied engaging in the behavior underlying such conviction. Father also shared with Davies that he was "pleased with his ability as a fighter and showed no remorse for the – the damage that he caused other people." *Id*. Based on the information provided by Father, Davies found Father to suffer from intermittent explosive disorder and adjustment disorder. Father did not participate in follow-up services with Davies to address his anger issues.

[7] During the six weeks Father was not incarcerated, he started participating in the Father Engagement Program (FEP). In the beginning, Father expressed "disgruntled emotions with DCS and the system." *Id*. at 72. It took several sessions for Father to shift his focus to the purpose of the FEP. Just prior to the TPR hearing, Father "really made some headway" by "not talking . . . so much about the issues . . . but moving on with some of the more important aspects of Fatherhood Engagement." *Id*. Father did express concern about his ability to parent Child.

[8] Additionally, when Father was not incarcerated, DCS arranged for Father to have supervised visits with Child. Father attended four out of six visits in March and April 2019. According to Keri Little, the visitation supervisor, Father was not prepared for visits and it took fifteen to twenty minutes for Child to warm up to Father. In Little's assessment, there was no bond between Father and Child, and Father seemed more interested in taking pictures of Child rather than interacting with Child. Little testified that there was "no affection" between Child and Father. *Id.* at 81.

[9] After his release in February 2019, Father lived with family members and obtained employment, although it was "off and on." *Id.* at 42. He was not always able to provide "legitimate paystubs and things of that nature for the employment." *Id.*

[10] In April 2019, Father was arrested for driving under the influence and resisting law enforcement. Due to his incarceration, visits with Child were suspended. Father, however, continued to participate in the FEP on a weekly basis while incarcerated. A.J. Mistry, Father's FEP case manager, testified that Father was doing well in the program and making progress. Father remained incarcerated for the duration of the proceedings.

[11] At a permanency hearing on June 6, 2019, DCS requested that the plan for Child be changed from reunification to adoption. The court found that Father had partially complied with the case plan and that Mother could not be located,

had not complied with the case plan, and had not participated in services. The court approved DCS's request.

[12] On July 10, 2019, DCS filed a petition to terminate Mother's and Father's parental rights to Child (TPR Petition). The court held an initial hearing on August 29, 2019, at which Father[1] appeared but Mother did not. A second initial hearing was held on November 21, 2019, at which Mother, who had been located and was in custody, appeared. The court held a factfinding hearing on the TPR Petition on January 24, 2020.

[13] At the start of the hearing, Father moved to dismiss the TPR Petition on the basis of "House Bill 1432." *Transcript Vol. II* at 24. Father explained:

> It was effective July the 1st of 2019 regarding parental incarceration, but it provides that a [CHINS] case must include a discussion and services and treatment to be available for the incarcerated parent at the facility where the person is incarcerated, and the parent or – and child must be afforded some kind of visitation opportunities unless it's not in the child's best interest and also requires that the CHINS disposition decree provide some kind of opportunity for the – a meaningful role for the parent in the child's life, that there must be a plan to include the incarcerated parent.

*Id.* Father asked the court to "keep that in mind and take that into consideration during the testimony . . . in this termination trial and then

---

[1] Father was still incarcerated.

consider that [] in your deliberation." *Id*. at 25. Mother joined in Father's motion to dismiss, explaining that it would be beneficial for Mother to wait for the outcome of a bond reduction hearing scheduled for the following month before moving forward with the TPR hearing. The court took the motion under advisement before the presentation of evidence began. Father again moved to dismiss the TPR petition during his closing argument, and Mother joined in the motion. Father asked for the dismissal so that "the child should not be – his father should not have his parental rights terminated from the child." *Id*. at 109. In support of the motion to dismiss, Mother requested "that she be given a chance to reunite with her child." *Id.* at 110.

[14] During the hearing, FCM Lydia Stepp testified without objection that Mother had a history of incarceration related to methamphetamine and that Mother tested positive for methamphetamine during the CHINS proceedings. DCS then introduced Exhibit D, copies of the results of drug tests administered to Mother, as business records of Forensic Fluids. Mother objected to the admission of such evidence, asserting that DCS had not laid a proper foundation to qualify the documents as business records under Evid. R. 803(6). Acknowledging a split in Court of Appeals decisions,[2] DCS argued that such

---

[2] *Compare In re L.S.*, 125 N.E.3d 628 (Ind. Ct. App. 2019) (holding drug test results inadmissible as business records), *trans. not sought*, with *In re J.B.*, 144 N.E.3d 763 (Ind. Ct. App. 2020) (holding drug test results qualify as business records), *trans. not sought*, and *In re A.B.*, 133 N.E.3d 754 (Ind. Ct. App. 2019) (holding drug test results admissible as business records), *trans. granted*.

went to the weight of the evidence, not its admissibility. The court "receive[d] the exhibit pending review" of the conflicting case law. *Transcript Vol. II* at 36.

[15] In addition to testifying about DCS's involvement with Mother and Father, FCM Stepp testified that Child had been in the same foster home throughout the proceedings, is bonded with his foster family, and is a "happy kid." *Id*. at 38. FCM Stepp did not believe that affording Mother and Father more time would be beneficial given their repeated incarcerations and failure to participate or complete services when not incarcerated. FCM Stepp further testified that she spoke with Mother about participating in services upon her release from her recent incarceration and Mother "wanted no part of it. She said she did not want to do therapy. She did not want the home-based case work. She wanted nothing." *Id*. at 49. In fact, Mother did not contact DCS after she was released. Father remains incarcerated with no definite date for his release. FCM Stepp supported DCS's plan of Child's adoption by his foster family.

[16] At the termination factfinding hearing, Mother testified that she and Child became homeless shortly after Father was incarcerated. Mother explained that she thought someone was drugging Child, that there was wiring on her car that was not there when she bought it, and that she was being followed and felt like someone was "going to try and harm [her] son, kill him, and have [her] blamed for it." *Id.* at 92. Mother also admitted that she had tested positive for methamphetamine when her son was not in her care.

[17]     On February 14, 2020, the court entered its order with the following relevant findings:

> 15.  Continuation of the parent/child relationship between Father and the Child is not in the Child's best interests.  The Child has little to no established bond or relationship with Father due to Father's lengthy, ongoing, and repeated absences from the Child's life caused by Father's inability to obey the law and keep himself out of jail and the underlying factors behind Father's actions and incarcerations are unlikely to be resolved in a reasonable period of time.  Following the Child's removal on September 13, 2018, Father only visited the Child four times.  These visits occurred over a span of roughly a month, beginning upon Father's release from incarceration as a result of his conviction for bestiality . . . and ceased due to Father's subsequent re-incarceration for operating a vehicle after forfeiting his license for life and resisting law enforcement. . . .  Further, Father's criminal history consists of varying crimes centering [on] rage and impulse control problems which . . . represent significant, ongoing barriers to Father's ability to adequately and appropriately parent the Child that are unlikely to be resolved within a reasonable amount of time, if ever.  Taking this together with the fact that the Child's foster placement being ready, willing, and able to adopt, continuation of Father's relationship with the Child is not in the Child's best interest.

> 16.  Continuation of the parent/child relationship between Mother and the Child is not in the Child's best interests.  Mother has little to no established bond or relationship with the Child.  Following the September 13, 2018 removal of the Child, Mother has not visited with the Child due to not only her repeated incarcerations for operating a vehicle while intoxicated, disorderly conduct, residential entry, possession of methamphetamine, and escape but also due to her extended absences as a result of her being missing and maintaining near zero contact with DCS throughout the life of the case while not

incarcerated. . . . Supporting documentation detailing Mother's positive drug screens for methamphetamine and cocaine were provisionally entered into evidence and made a part of the record as Petitioner's Exhibit D. Mother subsequently testified to having submitted to drug screens and admitted to having used methamphetamine. The original reason the underlying CHINS cause was initiated concerned Mother's erratic and paranoid behavior from having been under the influence of illegal substances and no evidence was presented that even suggests that Mother is willing or able to remedy those original reasons for removal in a reasonable period of time. Taking this together with the fact that the Child's foster placement being ready, willing, and able to adopt, continuation of Mother's relationship with the Child is not in the Child's best interest.

17. Termination of Mother and Father's parental rights is in the Child's best interests. The Child's foster placement is ready, willing, and able to adopt the Child. The Child is extremely well bonded to his foster placement and taking this together with the fact neither Mother nor Father have or appea[r] able to remedy the issues in this matter within a reasonable period of time it is in the Child's best interest to terminate both Mother and Father's parental rights in order to allow the Child's foster placement to adopt the Child and achieve the necessary permanency the Child deserves.

* * *

20. Based on the totality of the evidence and testimony presented, the DCS request for termination of both Mother and Father's parental rights is based on numerous factors and not solely based on one or both parents' incidents of incarceration.

*Joint Appendix of Parents Vol. 2* at 50-51. The court then concluded DCS had

proven by clear and convincing evidence that:

a) The [C]hild was removed from the parents on September 13, 2018, and has continued to remain continuously removed for more than 6 months since the Dispositional Decree was issued on December 13, 2018;

b) The [C]hild has been removed from the parents and has been under the supervision of DCS for at least fifteen (15) months of the most recent twenty-two (22) months, beginning on the date the child was first removed as a result of being alleged to be a CHINS on September 13, 2018.

c) There is a reasonable probability that the conditions that resulted in the [Child's] removal and the reasons for placement outside the home of the parents – namely, the inability and/or unwillingness of [F]ather to provide adequate and necessary care and custody of the child – will not be remedied;

d) There is a reasonable probability that, given the lack of any involvement or bond with [M]other and the minimal involvement or bond with [F]ather coupled with his strong bond with pre-adoptive foster placement, the continuation of the parent-child relationship poses a threat to the well-being of the [C]hild;

e) Termination of the parent-child relationship is in the best interest of the [C]hild;

f) The proposal made by DCS for the [Child] to be adopted by the present foster placement is a satisfactory plan for the care and treatment of the [Child.]

*Id*. at 53-54.  The court therefore terminated Mother's and Father's parental rights to Child.  Mother and Father now appeal.  Additional facts will be provided as necessary.

## Discussion & Decision

### *1.  Motion to Dismiss*

Mother and Father argue[3] that the court erred in denying their motion to dismiss the TPR Petition.  They assert that DCS's failure to provide them with services while they were incarcerated "deprived [them] of [their] substantive due process right to raise [Child] and also deprived [them] of [their] procedural due process right to fair proceedings."[4]  *Brief of Appellant Mother* at 14; *Brief of Appellant Father* at 12.

As a preliminary matter, we note that in order to properly preserve an issue for appeal, a party must, at a minimum, "show that it gave the trial court a bona fide opportunity to pass upon the merits of the claim before seeking an opinion on appeal."  *Endres v. Ind. State Police*, 809 N.E.2d 320, 322 (Ind. 2004).  At the start of the termination hearing, Father moved to dismiss asking the court to "consider the House Bill 1432" and its requirement that an incarcerated parent

---

[3] Although Mother and Father filed separate briefs, the first argument presented in both briefs is essentially verbatim.

[4] Mother and Father include in their argument that DCS's failure to provide reasonable services to the other also "impacted" their respective due process rights because "[e]nforcing or denying the constitutional rights of one parent necessarily impacts the other parent."  *Brief of Appellant Mother* at 14; *Brief of Appellant Father* at 12, 13.

be afforded some type of visitation and an opportunity to maintain a meaningful role in a child's life. *Transcript Vol. II* at 24.[5] Mother joined in the motion, noting that she had a bond reduction hearing the following month and wanted to postpone the termination proceedings pending the outcome of that hearing. Mother and Father did not further expound upon their argument and did not even hint that they were alleging a violation of constitutional rights. *See McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 194 (Ind. Ct. App. 2003) (noting the law is well established that a party on appeal may waive a constitutional claim). Indeed, they argue for the first time on appeal that DCS's failure to provide them with services and arrange for visitation with Child while they were incarcerated violated their due process rights. Mother and Father have therefore waived this issue for our review. *See In re K.S.*, 750 N.E.2d 832, 834 n.1 (Ind. Ct. App. 2001) (determining that mother waived her due process claim by raising it for the first time on appeal).

[20] Waiver notwithstanding, Mother and Father have not established a violation of their due process rights. When the State seeks to terminate parental rights, "it must do so in a manner that meets the requirements of due process." *In re J.K.*, 30 N.E.3d 695, 699 (Ind. 2015) (quoting *In re G.P.*, 4 N.E.3d 1158, 1165 (Ind. 2014)). Procedural due process addresses the right to a fair proceeding, and

---

[5] The trial court took the motion to dismiss "under advisement pending presentation of evidence in this matter." *Transcript Vol. II* at 25. The court officially denied the oral motion on February 19, 2020, reasoning, "Neither parent has maintained a meaningful role in the life of the child." *Joint Appendix of Parents Vol. 2* at 56. This was five days after the court entered its ordering terminating parental rights.

substantive due process involves a parent's right to raise his or her child(ren). *In re T.W.*, 135 N.E.3d 607, 613 (Ind. Ct. App. 2019), *trans. denied*. In the context of termination proceedings, a parent's due process rights include that DCS "must have made reasonable efforts to preserve and/or reunify the family unit." *Id.* at 615. "What constitutes 'reasonable efforts' will vary by case, and . . . it does not necessarily always mean that services must be provided to the parents." *Id.*

[21] Procedural due process requires that a litigant be provided "the opportunity to be heard at a meaningful time and in a meaningful manner." *In re K.D.*, 962 N.E.2d 1249, 1257 (Ind. 2012) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). In both CHINS and termination cases, "the process due . . . turns on balancing three *Mathews* factors: (1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing governmental interest supporting use of the challenged procedure." *Id.* Both a parent's interest in maintaining his or her parental rights and the State's countervailing interests in protecting the welfare of children are substantial. *In re C.G.*, 954 N.E.2d 910, 917 (Ind. 2011). Thus, when faced with a denial of due process claim in a CHINS or termination proceeding, the focus is most often on the risk of error created by the State's actions. *Id.* at 918.

[22] Substantive due process "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *City of Bloomington Bd. of Zoning Appeal v. UJ-Eighty Corp.*, 141 N.E.3d 869, 875 (Ind.

Ct. App. 2020); *see also G.B. v. Dearborn Cnty. Div. of Family & Children*, 754 N.E.2d 1027, 1032-33 (Ind. Ct. App. 2001), *trans. denied*. In setting forth a claim for a violation of substantive due process, a party must show either that the law infringes upon a fundamental right or liberties deeply rooted in our nation's history or that the law does not bear a substantial relation to permissible state objectives." *City of Bloomington*, 141 N.E.3d at 875.

[23] In support of their argument, Mother and Father cite I.C. § 31-34-15-4(7), which provides that a child's case plan in a CHINS proceeding must include "a description and discussion" of "the services and treatment available to the parent at the facility at which the parent is incarcerated" and "how the parent and the child may be afforded visitation opportunities, unless visitation with the parent is not in the best interests of the child." *Id*.

[24] We first note that this statutory provision concerns only the form and contents of a case plan; it does not require DCS to offer services and/or visitation to incarcerated parents. In other words, the statute does not confer a right to such services for incarcerated parents. Indeed, a plain reading of the statute makes clear that such is not intended to be of constitutional dimension. Further, the specific subsection upon which Mother and Father rely, was not in effect when the case plan for Child was developed. It became effective July 1, 2019, after the permanency plan changed to adoption and nine days before the TPR Petition in this case was filed. Thus, at the time the case plan for Child was developed, there was no requirement that the case plan include a discussion of treatments and/or services available to incarcerated parents.

[25] Mother and Father also argue that they were not provided all reasonable services to reunify them with Child and that such failure violated their due process rights. In support of this argument, Mother and Father direct us to several cases. In *Matter of F.A.*, 148 N.E.3d 353 (Ind. Ct. App. 2020), one of the cases cited by them, DCS had moved to dismiss the CHINS case in January 2019 because the children were living with the parents and were doing well and were happy, the home was in good shape, and the date for reunification and closing of the case was March 15, 2019. Then, after an altercation between the mother and one of the children, DCS immediately moved to terminate parental rights without attempting to address the issue with services. The parents' rights were terminated, and they appealed. This court reversed the termination order, holding that, under the circumstances, DCS had not made all reasonable efforts to reunify the parents with the children following the altercation. *Id*. at 359.

[26] In *T.W.*, DCS made several service referrals for the father. When he showed up for his first visit, he learned that DCS cancelled his visits without informing him. At the TPR factfinding hearing, the FCM explained that DCS suddenly cancelled the father's visits when it realized that due to his extensive incarceration, he did not have a prior relationship with the child. The father was also referred for drug screens, but the FCM did not make a reasonable effort to advise him of such. The father also requested help with transition to life following his release from incarceration, but the FCM made no referral to assist him. Two weeks before he was to begin work release after a probation violation, DCS filed for termination of the father's parental rights. His rights

were terminated, and he appealed. This court reversed, holding that, considering the totality of the situation, "DCS wholly failed to make reasonable efforts to preserve" the parent-child relationship and that "the insufficient process employed in the CHINS case created a risk of erroneous filing of a petition to terminate Father's parental rights to Child, in violation of Father's due process rights." *T.W.*, 135 N.E.3d at 618.

[27] We find the cases cited by Mother and Father distinguishable from the circumstances of this case. Here, DCS made numerous referrals for Mother. Mother visited with Child one time shortly after he was removed and she did not participate in any other services. Mother did not stay in touch with DCS, and DCS attempted to locate her by contacting family and friends and through the services of a private investigator, but to no avail. Finally, Mother indicated to FCM Stepp that she was not interested in participating in services upon her release from jail and indeed, did not contact DCS when she was released. Mother's own actions and omissions kept her from participating in services.

[28] With regard to Father, DCS made several referrals and, after his release from incarceration, Father participated in services, visiting with Child on four occasions and participating in an evaluation as well as the FEP program. Father's participation with supervised visitation and his ability to participate in follow-up counseling services were hindered when Father was arrested on new charges within two months of his release. After his most recent arrest, Father did, however, continue to participate weekly in the FEP program while incarcerated. The crux of Father's argument is that his due process rights were

violated because DCS did not arrange for continued visitation with Child while he was in jail, thereby hampering his ability to maintain a bond with Child. As noted above, the visitation supervisor testified that there was no bond between Father and Child, that Father showed no affection toward Child, and that he was not interested in engaging with Child during his visits. Further, contrary to Father's claim, DCS was not required to provide him with visitation with Child while he was incarcerated. Considering the totality of the circumstances, it was Father's criminal conduct, not the process employed by DCS, that interfered with Father's ability to participate and complete services. Mother and Father were provided with all the procedure and process to which they were entitled.

## 2. Mother – Admission of Evidence

[29] Mother argues that the trial court abused its discretion in admitting her drug test results, over her objection, as certified business records under Evid. R. 803(6).[6] As noted in footnote 2 above, there was a split of authority regarding whether drug test results qualify as business records. On October 15, 2020, our Supreme Court resolved the conflict, holding that drug test results were sufficiently reliable to be admitted under Evid. R. 803(6), the business records exception to the hearsay rule. *See In re A.B.*, 20S-JT-63, 2020, ___ N.E.3d ___ WL 6065769 (Ind. Oct. 15, 2020). Mother's drug test results were therefore admissible.

---

[6] The court provisionally admitted DCS's Exhibit D, which consisted of Mother's drug test results, pending its review of conflicting case law. In its ordering terminating parental rights, the court noted that such evidence was "provisionally" admitted, but then found that Mother admitted to submitting to drug screens and to using methamphetamine. *Joint Appendix of Parents Vol. 2* at 51.

### 3. Father – Sufficiency of the Evidence

[30]     When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016). Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*. In light of the applicable clear and convincing evidence standard, we review to determine whether the evidence clearly and convincingly supports the findings and whether the findings clearly and convincingly support the judgment. *In re R.S.*, 56 N.E.3d at 628.

[31]     We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id*.

Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by clear and convincing evidence, among other things, that one of the following is true:

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B); Ind. Code § 31-37-14-2. DCS must also prove by clear and convincing evidence that termination is in the best interests of the child and that there is a satisfactory plan for the care and treatment of the child. I.C. § 31-35-2-4(b)(2)(C), (D); I.C. § 31-37-14-2. Father challenges the court's conclusions as to I.C. § 31-35-2-4(b)(2)(B)(i) and (ii) and the court's conclusion that termination was in the best interests of Child. We begin with the former.

### *Conditions Not Remedied*

I.C. § 31-35-2-4(b)(2)(B) is written in the disjunctive and, thus, requires the trial court to find only one of the three requirements of the subsection by clear and convincing evidence. *See In re L.S.*, 717 N.E.2d at 209. Here, we will focus our review on the trial court's determination that there is a reasonable probability

that the conditions that resulted in the child's removal and/or continued placement outside Father's home will not be remedied.

> In making such a determination, the court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. Due to the permanent effect of termination, the trial court also must evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, "but also those bases resulting in the continued placement outside the home." *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*. A court may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. Moreover, a trial court "can reasonably consider the services offered by the [DCS] to the parent and the parent's response to those services." [*McBride*, 798 N.E.2d at 199]. In addition, "[w]here there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005).

*In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013) (some citations omitted).

[34] In challenging the sufficiency of the evidence regarding whether he is likely to remedy the conditions leading to removal, Father disputes only the court's finding that he did not have a bond with Child. As set out above, however, Father visited with Child only four times and the supervisor testified that Father and Child did not appear to have a bond and that "there was no affection"

between them. *Transcript Vol. II* at 81. Father did not come prepared to the visits and was not focused on engaging with Child. Father has been incarcerated for most of the Child's young life and there is no definitive timeline for his release. The court's findings regarding Father's explosive disorder, criminal history, and continued incarcerations further support its determination that there is a reasonable probability that the circumstances giving rise to Child's removal, i.e., Father's inability to care for Child, will not be remedied "within a reasonable amount of time, if ever." *Joint Appendix of Appellants Vol. 2* at 50.

### *Best Interests*

[35]   Father also challenges the court's conclusion that termination of his parental rights is in the best interests of Child. In making this best-interests determination, the trial court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013). The court must subordinate the interest of the parent to those of the child and need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *McBride*, 798 N.E.2d at 199. Our Supreme Court has explained that "[p]ermanency is a central consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). "Moreover, we have previously held that the recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that

termination is in the child's best interests." *In re. J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009).

[36] Child was removed when he was just five months old because Father was incarcerated when Mother suffered a "mental health crisis" and could not care for Child. *Transcript Vol. II* at 43. It has been just over two years since Child's removal and Father has been incarcerated for all but approximately six weeks of that time. As found by the court, Father's continued incarceration and lack of accountability for his actions "represent significant, ongoing barriers to [his] ability to adequately and appropriately parent the Child." *Joint Appendix of Appellants Vol. 2* at 50. Child is thriving and happy in his foster placement and DCS's plan is for Child to be adopted by his foster family. The FCM testified that termination was in Child's best interests because it afforded Child permanency. The trial court agreed. The record supports the trial court's determination in this regard. Father has not shown that the trial court erred in determining that termination was in Child's best interests.

[37] Judgment affirmed.

Riley, J. and May, J., concur.